44 N.J. Super. 149 (1957)
129 A.2d 885
MARY PODKOWICZ, ALSO KNOWN AS MARY POTKOWICZ, PLAINTIFF-APPELLANT,
v.
JOHN SLOWINESKI AND VERONICA SLOWINESKI, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued February 25, 1957.
Decided March 11, 1957.
*151 Before Judges GOLDMANN, FREUND and CONFORD.
Mr. Laurence Semel argued the cause for appellant.
Mr. Lawrence Friedman argued the cause for respondents (Mr. Irwin Goldfinger, attorney).
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
This is an appeal from a Chancery Division judgment dismissing plaintiff's action after a full *152 hearing. The complaint charged defendants with breach of their written agreement with plaintiff whereby she agreed to advance, and did advance, the sum of $4,000 to defendants to be used for the purchase of a dwelling on South Clinton Street, East Orange, in return for which they were to furnish her with a home and private room in said premises, and to support and care for her for the rest of her natural life. Plaintiff demanded judgment impressing a lien upon the premises, or in the alternative, a judgment of $4,000 or a judgment requiring defendants to convey the premises to her. The answer denied breach of the contract and, by way of separate defense, alleged that defendants have at all times been ready, willing and able to comply with the agreement, had tendered compliance, but plaintiff refused and still refuses to accept the benefits due her under the agreement.
The pretrial order projected an entirely different theory of action, namely, that defendants induced plaintiff, an aged lady, to enter into the agreement and that in doing so she pauperized herself, and this without having the benefit of independent, competent and disinterested advice. The case was tried and decided on that basis.
Plaintiff was about 88 years old at the time of the agreement. The trial judge described her at the time of the trial in April 1956 as "in a good state of health for one of her years. Mentally she appears to be strong-willed and normally perceptive." Her testimony reveals a clear mind and a determined nature, and also that she had a clear understanding of the transaction she now attacks.
On December 28, 1954, the date of the agreement, plaintiff had $5,500 or more in cash. For some months preceding she had visited defendants at their home on St. Francis Street, Newark, eating an occasional meal with them. Defendant John Slowineski is her second cousin. The St. Francis Street place had only four rooms in which defendants and their five children lived. On one occasion plaintiff suggested that for the monthly rent they were paying defendants could own a house. Told by them that they did *153 not have funds to make a down payment, she offered to put up the money. Although plaintiff denies that the house was purchased at her suggestion, the trial court's finding that it was has clear support in the record.
Plaintiff and defendants then proceeded to look at various houses; she liked the South Clinton Street property and defendants decided to buy it. The parties then went to the office of defendants' attorney with a view to having him act for them in the title closing. They told him of the agreement they had reached, and he thereupon suggested that a contract be prepared and executed. This was done; the agreement was read to plaintiff in English and explained to her in Polish and, as plaintiff herself testifies, she was satisfied with the arrangement.
The agreement acknowledges receipt of $1,000 from plaintiff, representing the deposit on the purchase of the property. It recites that plaintiff agrees to give defendants an additional $3,000 to be used as a down payment at the time of taking title. Then follows defendants' express agreement to provide a home, support and care for plaintiff during her life, and to pay all funeral expenses upon her death.
Plaintiff moved into the Slowineski home on St. Francis Street about January 1, 1955. They charged her no board or rent, and she admits that she was treated well and all was peaceful. On April 1, 1955 she and the Slowineskis moved into the new home on South Clinton Street. She quit the place three days later, returning only to get her belongings on April 11. Plaintiff testified that the cause for her departure was that defendants had learned she still had money left and demanded $1,000 of her, as well as $10 a week board. She claims they abused her; that Mrs. Slowineski threatened she would take her down to the cellar and cut her throat (this was later changed to a threat that defendant would cut her own throat); that defendants' son threatened to throw her down the stairs and break her bones; that Mrs. Slowineski and her son called plaintiff a drunkard and other names, and when she refused to give them $1,000 *154 they chased her out of the house. None of plaintiff's testimony was corroborated; she was her one and only witness.
Defendants testified to the events leading up to the purchase of the house and their moving into it. The property cost them $10,500, the balance above plaintiff's $4,000 contribution being represented by a mortgage. Defendants and their son flatly denied all of plaintiff's accusations; there was no demand for additional money or board, no name calling, no threats. The only incident was one which happened immediately after the parties moved into the premises. It appears that plaintiff wanted to plant string beans in the front lawn and Mrs. Slowineski suggested that she do so in back of the house. Defendants asked plaintiff to stay when she quit the place; they want her to return now. Slowineski testified: "I honestly want her to come back." He had no hard feelings; "I don't know of any reason that would get a person angry enough to leave." His wife said: "I want her back; the room is there." When the trial judge inquired of plaintiff: "Suppose these people are sorry for what they did and want you to come back; would you go?," her answer was: "No, I will never return." In another place she said: "They called me nasty names and I cannot ever look at them; I cannot face them."
The trial judge found that plaintiff had no good reason to leave the home defendants had provided for her, and he believed defendants' personal importuning of plaintiff to return was entirely honest and sincere. Although plaintiff had no independent advice when she executed the contract, he found that she had suffered no impoverishment; what she had done was to provide herself with maintenance and support for the rest of her days. He found no undue influence: "From first to last the defendants in their acquisition of the property were entirely passive to plaintiff's furtherance." Dismissal of the complaint followed.
Plaintiff argues three points: (1) the agreement of December 28, 1954 is void because she had no independent advice; (2) the transfer of $4,000 of her funds was improvident, and the trial court erred in finding otherwise; and *155 (3) defendants' conduct justified her leaving the home and so constituted a breach of the contract.
There is no merit whatsoever in plaintiff's third point. After carefully considering all the proofs and the impression left upon him by each of the parties, the trial judge concluded that plaintiff "had no good or adequate reason to leave the home defendants had provided for her." He believed defendants to be entirely honest and sincere in their profession of a genuine attachment for plaintiff, their gratitude to her for her assistance, and their wish that she return to their home. His was the responsibility of adjudging credibility and assessing good faith. We cannot set aside his factual conclusions.
The first two points have been comprehensively treated in In re Fulper's Estate, 99 N.J. Eq 293 (Prerog. 1926); Giacobbi v. Anselmi, 18 N.J. Super. 600 (Ch. 1952); and Seylaz v. Bennett, 5 N.J. 168 (1950), where the authorities are collected and analyzed.
The basic rule, first projected in Mott v. Mott, 49 N.J. Eq. 192, 198 (Ch. 1891), adopted in Hall v. Otterson, 52 N.J. Eq. 522 (Ch. 1894), affirmed 53 N.J. Eq. 695 (E. & A. 1895), and expressly reiterated by the Court of Errors and Appeals in Slack v. Rees, 66 N.J. Eq. 447 (1904) is:
"In all transactions between persons occupying relations, whether legal, natural or conventional in their origin, in which confidence is naturally inspired, is presumed, or in fact reasonably exists, the burden of proof is thrown upon the person in whom the confidence is reposed and who has acquired an advantage, to show affirmatively, not only that no deception was practiced therein, no undue influence used, and that all was fair, open and voluntary, but that it was well understood." (52 N.J. Eq., at page 528)
Most of the cases invoking the rule involved transfers by way of gift. However, the rule by its very terms applies to "all transactions" where the dominant person in whom confidence is reposed acquires an advantage. Consideration for the transfer is not a conclusive factor, but at best only one element of the proof which defendant, in an appropriate case, *156 is called upon to make. In re Fulper's Estate, above, 99 N.J. Eq., at page 303.
The primary consideration in any application of the rule must first and above all be whether the parties to the transaction occupied a relation of confidence. The burden of proving the existence of the dominant confidential relationship required to bring the rule into operation is always on the one who seeks to set aside the transfer. Giacobbi v. Anselmi, above, 18 N.J. Super., at page 616. Where such relationship is not shown, the presumptions against the transferee are not raised, even though the transfer be without valuable consideration and improvident. In re Fulper's Estate, above, 99 N.J. Eq., at page 313; Seylaz v. Bennett, 5 N.J., at page 175. As noted in Fulper, the relationship is not capable of exact definition or delimitation:
"The relationship includes not only all cases of technical, legal, fiduciary relationship, such as guardian and ward, principal and agent, trustee and cestui que trust, but also all cases where trust and confidence actually exist. It comprehends, as is said in Cowce v. Cornell, 75 N.Y. 91 (quoted in Mott v. Mott, supra, and in other cases in this state), all cases where "the relations between the parties appear to be of such a character as to render it certain that they do not deal on terms of equality, but that either on the one side from superior knowledge of the matter derived from a fiduciary relation, or from over-mastering influence; or on the other from weakness, dependence or trust justifiably reposed, unfair advantage is rendered probable.' It exists, as is said, in Slack v. Rees, supra, when the parties occupy `relations, whether legal, natural or conventional in their origin, in which confidence is naturally inspired, or, in fact, reasonably exists'; `where the parties hold positions in which one is more or less dependent on the other.'

* * * * * * * *
* * * no hard and fast rule can be laid down. The conclusion must be drawn in each case from the particular circumstances there existing." (In re Fulper, 99 N.J. Eq., at pages 314, 315.)
There is no showing of physical or mental incapacity in this case. On the contrary, plaintiff was found to be in full mental vigor and in good physical condition at the time of the agreement. Collum v. Deane, 6 N.J. Super. 243 (App. Div. 1950), and Diebold v. Roder, 117 N.J. Eq. 289 (Ch. 1934), cited by plaintiff in support of her claim of lack of *157 independent advice, are immediately distinguishable from the case at hand on these grounds alone. Each of the plaintiffs in those actions was not only aged, but the victim of serious physical infirmities. Nor was plaintiff at all dependent upon or servient to defendants. She appears to have been the moving force. It was she who initiated the plan of purchasing the home, who suggested that she was willing to provide the necessary funds, and who convinced defendants of the wisdom of buying a larger house in which all of them could live. Her interest was an active and continuing one, extending even to her going along with defendants in search of a property adequate to their needs. There is nothing to indicate that advantage was taken of her. She fully understood and agreed to the terms of the agreement. In short, she knew exactly what she was doing and why. The circumstances here present are in stark contrast to those present in the many cases which dot our reports, e.g., Slack v. Rees, above, 66 N.J. Eq. 447; Giacobbi v. Anselmi, above, 18 N.J. Super. 600.
Entirely absent, then, is the "undue influence" so often mentioned in the cases dealing with the subject of voidable transfers. There was no dominant confidential relationship to trigger the operations of the rule of Hall v. Otterson, above. This being so, independent advice was not a prerequisite to the validity of the agreement and transfer of funds thereunder. Seylaz v. Bennett, above, 5 N.J., at page 173.
Nor may plaintiff prevail on her second point, where she claims that the agreement and transfer of $4,000 of her funds was improvident. Even assuming the existence of a dominant confidential relationship, it is clear that the transaction was not an improvident one, in which case our courts would require that the donor have the benefit of independent, competent and disinterested counsel and a showing that she fully understood and intended the consequences of her act, to paraphrase the language of Seylaz v. Bennett (5 N.J., at page 173, and the cases there cited). Cf. Giacobbi v. Anselmi, above, 18 N.J. Super., at page 618, *158 where a dominant confidential relationship existed but the conveyance by plaintiff to her daughter and son-in-law was held not improvident because the grantees had assumed payment of a balance due under an existing mortgage and county liens for old age relief given.
In exchange for her $4,000 plaintiff, as already mentioned, was to receive a private room, food and other accommodations, and necessary medical expenses for life. Defendants were to pay her funeral expenses at death. A signed addendum to the contract provided that if defendants predeceased plaintiff and their heirs failed to carry out all the terms of the agreement, plaintiff's money was to be returned to her in full by the estate. Although a verbal promise to support plaintiff for life would not relieve defendants from the operation of the rule of independent advice, Giacobbi v. Anselmi, above, 18 N.J. Super., at page 617, and cases cited, the written agreement to do so was adequate to prevent the transaction from being improvident. In re Fulper's Estate, above, 99 N.J. Eq., at pages 311, 312; Soper v. Cisco, 85 N.J. Eq. 165, 174 (E. & A. 1915). There was a valuable consideration for plaintiff's undertaking; the bargain was a natural and provident one for her to make.
In conclusion, it should again be noted that defendants are entirely willing to carry out their part of the agreement and, from the record, we cannot say it should not have convinced the trial court, as it did, that they were entirely honest and sincere when they so stated to plaintiff at the time of her leaving, and again in open court. Our disposition of this appeal does not relieve them of their agreement.
The judgment of the Chancery Division is affirmed.